UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  22-80107-CR-CANNON

UNITED STATES OF AMERICA

vs.

SELWYN DAVID ROSENSTEIN,

Defendant.
_____/

GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE
PRETRIAL SENTENCE REPORT

COMES NOW the United States of America, by and through the undersigned Assistant
United States Attorney, and hereby files the following response to the Defendant's Objections to
the Pretrial Sentence Report.

1. Response to the Objection to 5-level SOC of USSG 2G2.2(b)(3)(B)

In his objections to the PSR, Defendant argues that the PSR incorrectly applied an upward
adjustment regarding Defendant's admitted distribution of child pornography. Section
2G2.2(b)(3)(B) provides for a 5-level adjustment if the offense involved the distribution of child
pornography "for the receipt, or expectation of receipt, of a thing of value." Defendant does not
deny that he distributed child pornography. (Plea Agreement ¶ 1). Instead, he denies that he
distributed child pornography for the purpose of receiving additional child pornography. In other
words, Defendant argues that his distribution of child pornography was purely gratuitous; that is,
out of the kindness of his pedophilic heart.

During his post-*Miranda* interview with the FBI, ROSENSTEIN acknowledged that he
was a high-ranking staff member of Website A and had been a member of the website between
approximately 2018 and the date of his arrest.  PSR ¶ 34.  He estimated that he was the third or

1

fourth highest-ranking member of the website. *Id.* In this capacity, he posted rules and advice for other Website A users to follow, including about how Website A users should post and categorize child pornography links. *Id.* On at least one occasion, he made a post instructing Website A users to include descriptive text when posting links to child pornography files that specifies the age and gender of the child victim and the sex act depicted in the file. *Id.* Rosenstein told the FBI that websites like Website A are a matter of "freedom" and are essential for people to express themselves, and he does not believe that exchanging child pornography is harmful because the harmful acts have already taken place. *Id.*[1] He also admitted that he routinely collected and shared links to child pornography with his fellow Website A staff members to assist them in deciding which other users to promote. *Id.* ¶¶ 28-29, 33. Defendant also maintained an enormous collection of child pornography on devices stored in his home. *Id.* ¶¶ 35-37.

Based on these undisputed facts, the Court can and should reasonably infer that Defendant distributed child pornography in exchange for something of value—that is, the continued existence of Website A and the large volumes of child pornography that he had access to by virtue of his leadership position on the website. He admitted to law enforcement that he distributed the links to his fellow staff members to ensure a reliable and well-functioning staff for the website that would keep it functioning.

The Eleventh Circuit has held that sharing child pornography to remain in a group and gain access to others' child pornography meets the criteria under § 2G2.2(b)(3)(B). *See United States v. Bender*, 290 F.3d 1279, 1286-87 (11th Cir. 2002) ("Joining several of our sister circuits, we hold that when a defendant trades child pornography in exchange for other child pornography, the

---

[1] The defendant asserts that this notion are incorrect and that the children in the images and videos he shared and received are victims. DE 36:2. This is no matter. What a defendant professes at sentencing does not detract from his beliefs at the time he committed the offense. In fact his desire for "freedom" was a desire to freely exchange child pornography without regulation, which is why he chose to engage in the same on the Darkweb.

defendant has engaged in 'distribution for the receipt, or expectation of receipt, of a thing of value' as provided in the 2000 version of [U.S.S.G.] § 2G2.2(b)(2).").

In *United States v. Ramnaraine*, for example, the defendant used a file-sharing program called Gigatribe to trade child pornography. 730 F. App'x 749, 751 (11th Cir. 2018). In a chat recovered from the defendant's computer he told another user, *40 "[e]ither you share or I will ban you." *Id.* The Eleventh Circuit found that the use of the file-sharing program combined with the chat was "sufficient evidence that [the defendant] conditioned his sharing of child pornography on a return promise to share." Id. "[E]ven without an explicit quid pro quo agreement with another distributor of child pornography, a person may engage in such conduct with the reasonable expectation of an exchange." *United States v. Cote*, 482 F. App'x 373, 376 (11th Cir. 2011).

This factual scenario is very different from cases where a defendant simply uploads child pornography to a peer-to-peer sharing network and there is no "evidence, whether direct or circumstantial, that a defendant reasonably believed that he would receive something of value by making his child pornography files available for distribution through a peer-to-peer network." *United States v. Vadnais*, 667 F.3d 1206, 1209 (11th Cir. 2012). Here, there was evidence showing "the connection between the defendant's distribution and the receipt or expectation of receipt of a thing of value" - namely, the fact that he shared child pornography so that Website A could continue to be smoothly managed and available and he could maintain access to the child pornography exchanged within it. *See id*. Therefore, there is no error in applying the special offense characteristic.

Courts have repeatedly affirmed the application of the 5-level adjustment under similar facts. For example, in *United States v. Alaniz-Allen*, 579 F. App'x 255 (5th Cir. Aug. 25, 2014), the Fifth Circuit rejected a defendant's similar argument because, despite his assertions otherwise,

his "actions evidenced an interest in sharing and receiving child pornography." Id. at 255. The Fifth Circuit did not articulate any specific actions, but the United States, in its appellate brief, explained that those actions included the defendant's own admission to law enforcement that he had "utilized the internet . . . for file sharing purposes" and that he had begun using file sharing networks several years ago. (Gov't Br., Alaniz-Allen, 13-40877, at 31 (quoting PSR ¶ ¶ 7-8).) In other words, the use of the file sharing networks and the experience of using such for an extended period of time was enough for the *Alaniz-Allen* court to conclude that the defendant "evidenced an interest in sharing and receiving child pornography" sufficient for the sentencing court to conclude that the 5-level adjustment was appropriate. Here, Defendant Rosenstein has demonstrated similar actions and experience. Like the defendant in *Alaniz-Allen*, Rosenstein obviously has considerable experience and understanding of websites meant for the distribution of child pornography and how they work.

Similarly, in *United States v. Onken*, 440 F. App'x 304, 305 (5th Cir. 2011), the defendants in that case were "sophisticated users of computers and file-sharing programs" and that their "knowing contribution to the exchange of images of child pornography shows that they had an interest in facilitating access to child pornography so that they could obtain more of it from the file-sharing network." Consequently, the *Onken* court also affirmed the application of the 5-level adjustment for distribution for receipt, or expectation of receipt, of a thing of value. *See also United States v. Roman*, 393 F. App'x 149, 150 (5th Cir. 2010) ("[Defendant's] exchange of images with other purveyors of child pornography supports that he had an interest in facilitating a continuing relationship involving the reciprocal transfer of images, i.e., [the defendant] distributed images with the expectation that he would receive other images of child pornography or maintain a relationship with others who distributed child pornography.").

4

This Court can reasonably infer that Defendant Rosenstein was very experienced in the Darkweb file-sharing program and in the way they worked. Therefore, this Court should reach the same conclusion that the 11th and 5th Circuits have repeatedly reached and affirmed on similar facts: Defendant has demonstrated experience with this software, understood the sharing features, and therefore sought to share those images to allow Website A to continue functioning while at the same time downloading other images shared by other users of the site. Consequently, the five-level upward adjustment should apply.

2.   **Response to the Objection to 4-level Enhancement of USSG 3B1.1(a)**

Defendant next disputes that he should receive an enhancement under USSG § 3B1.1(a) for being a manager or supervisor.  He does not appear to dispute that the criminal activity involved five or more participants or was otherwise extensive.  Nor does he appear to contest the facts set forth in the PSR that set out his authority and duties on Website A.

This objection is belied by the evidence and should be overruled.  Defendant now tries to characterize his role on the website as largely ministerial and lacking in any real authority.  But this assertion cannot be squared with the evidence, including his statement to FBI agents that, in his own opinion, he was the ***third- or fourth-highest ranking individual*** on the entire website, which included thousands of users.  PSR ¶ 33.  In particular, he made the following statements during his post-*Miranda* interview with the FBI:

| | |
|---|---|
| FBI Special Agent: | …where would you put you in the hierarchy? I mean, you're obviously a high-level member of this site. …  Number one? Number two?  You're not number one. |
| Defendant: | I'm not number one. |
| FBI Special Agent: | We know who number one is. |
| Defendant: | I'm not number two. |
| FBI Special Agent: | But you're definitely in the higher level. |

| Defendant: | I'd say I'm in the high level, yeah. |

Audio Recording of Defendant's Interview at 23:10-23:36.  And again, later in the interview:

| FBI Special Agent: | When you talk about rank, if we have a tier and [other Website A user] is the top tier, would you be considered the second tier…? Who's the next level in terms of staff or rank? |
| Defendant: | I am pretty high up there. |
| FBI Special Agent: | Would you consider yourself number two?  Three?  Four? |
| Defendant: | I'd say number three or four. |

*Id.* at 1:54:19-1:54:59.

In describing himself as "number three or four" on Website A, Defendant was not exaggerating his role in administering and managing the website.  If anything, he was understating it.  In fact, the FBI believes that he was the second-highest ranking individual on Website A, and with good reason.  PSR ¶ 33.

Among his other duties to Website A, Defendant directly voted on promotions of other members.  For example, he was part of an ongoing chat in an exclusive staff room that included only approximately five top-level administrators of Website A, including him.  On multiple occasions while within this room, Defendant voted on whether to promote other Website A users to various staff positions.

While within this room, he stated that he removed or edited posts made in Website A's rooms, he proposed duties for other Website A users, he proposed a system under which members would be expected to work toward a promotion or risk being demoted, he advised his fellow staff members on where to store the keys to access the website, and he created scripts that other staff members could use to congratulate other Website A members on certain noteworthy occasions,.

Even outside this room, Defendant exercised authority over Website A and its users.  He frequently sent private messages to other Website A users, and these messages reveal that

Defendant, among other things, provided guidance and instructions to other staff members on how to moderate and administer Website A, he banned users, and he reset user passwords.

Defendant had public-facing authority on Website A as well.  On multiple occasions, he instructed other individuals on the site how to share child pornography in a particular manner consistent with the rules of the website.  PSR ¶ 27.  He also provided other users with advice regarding how to stay secure, remain anonymous, and evade law enforcement.  *Id.* ¶ 26.  His computer contained scripts, or stock messages, that could be posted to Website A to guide other users, including on how to post child pornography in a way that makes it easier for other users to search for and locate.  *Id.* ¶ 36(e).

Defendant also had significant levels of authority with regard to the technological maintenance and responsibility for Website A.  For example, he was one of only three or four individuals who had direct access to the Website A servers.  He backed up the servers, maintained those backups, and imported them whenever the website crashed.  He also compiled and maintained records—which he called "statistics"—on child pornography posts made by other Website A users.  He shared these "statistics" with his fellow Website A staff members to assist in making decisions on whom to promote.  PSR ¶¶ 28-30, 33.  Using his technological prowess, he created a script to automatically compile posts made by other users so the "statistics" could be maintained in one place.

Defendant's significant level of authority over Website A and its users was corroborated by the highest-ranking individual on Website A ("User-1"), who told the FBI that Website A was managed by a small group of individuals—himself, Defendant, and two or three other administrators—who had "equal" status.  User-1 also stated that only he, Defendant, and one other person had access to the Website A server.  User-1 also told the FBI that he had a low opinion of

another Website A moderator ("User-2") and did not want User-2 part of the staff at all, but User-2 was Defendant's "project."

This level of responsibility is more than sufficient to establish that Defendant was an organizer or leader of Website A for the purposes of Section 3B1.1(a).   In making this determination, the Sentencing Guidelines counsel courts to consider a nonexclusive list of factors, including "the exercise of decisionmaking authority," "the nature of participation in the commission of the offense," "the recruitment of accomplices," "the degree of participation in planning or organizing the offense," "the nature and scope of the illegal activity," and "the degree of control and authority exercised over others."  USSG § 3B1.1, cmt. 4; *see also United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005) ("There is no requirement that all the considerations have to be present in any one case.").

These factors strongly support a finding that Defendant was a leader and organizer of the criminal conspiracy underlying Website A.  His admission was he was in a high-ranking leadership position in the criminal conspiracy underlying Website A makes clear that his participation in the offense was significant and far removed from that of the ordinary, casual user of Website A. Among other things, he exercised decisionmaking authority by voting on the promotion of other users and being part of a small group of leaders who administered the website.  His technological responsibilities for maintaining and administering the website and his maintenance of "statistics" for other Website A management reveal that he was involved in the planning and organizing of Website A.

Defendant also exercised a degree of control and authority over others by broadly providing directions to Website A users about how to post and share child pornography.  As noted above, he provided instructions and guidance to other staff members on how to moderate Website A.

8

Directing the activities of others is a key consideration in determining whether an individual is a leader or organizer. *See, e.g., United States v. Mesa*, 247 F.3d 1165, 1169-70 (11th Cir. 2001) ("evidence in this case was presented that defendant directed the activities of several people… The cumulative effect of directing these activities in furtherance of the offense is sufficient for a sentencing court to find that the Defendant acted as an organizer/leader for the purposes of U.S.S.G. § 3B1.1(a)"). User-1's statement that he did not want User-2 involved with the website but that he was Defendant's "project"—which implies that User-2 remained a moderator of Website A only because of Defendant's insistence—strongly suggests that Defendant exercised a degree of authority over or with respect to User-2 in particular.

Defendant's arguments to the contrary are without merit. He largely claims that he played a role akin to an IT technician and had no involvement in site management. This is inconsistent with Defendant's own statements and the abundance of evidence that he was part of a small group of high-level decisionmakers who managed the entire site. Likewise unavailing are Defendant's claims that all of his actions were done at the direction of others. Even if there were evidence in the record to support this assertion—and there is not—it is not dispositive. To take just one example, there is no dispute that Defendant provided rules and advice to Website A users about how to share child pornography over the website. PSR ¶ 27. Giving others specific instructions on how to commit a crime cuts in favor of a finding that an individual is an organizer or leader. *See, e.g.,*; *see also United States v. Caraballo*, 595 F.3d 1214, 1232 (11th Cir. 2010) (affirming imposition of 3B1.1(a) enhancement because, among other things, "Caraballo gave Lopez and Miranda specific instructions on how to commit the crime"); *United States v. Suarez*, 313 F.3d 1287, 1294 (11th Cir. 2002) ("affirming imposition of 3B1.1(a) enhancement because, among other things, the defendant "gave the undercover agents detailed instructions for transporting the

9

drugs").  This can be true regardless of whether other, higher-ranking individuals were involved in the conspiracy.  *See United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006) (affirming imposition of 3B1.1(a) enhancement because, among other things, the defendant "exercised authority over the organization by recruiting and instructing co-conspirators," despite the fact that "others may have had a larger role in the conspiracy…"); U.S.S.G. § 3B1.1, cmt. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

### 3. Response to the Objection to 2-level SOC of USSG 2G2.2(b)(6)

Defendant contests the inclusion of the special offense characteristic, pursuant to USSG § 2G2.2(b)(6), which states, "[i]f the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by **2** levels." (PSR ¶ 57).  He asserts that because a computer is used in nearly every cases, this Court should simply disregard the special offense characteristic.  He also makes a similar objection to the 2-level adjustment for his material involving a prepubescent minor – "It is the same click of the same button."  DE 36:4.

While the Sentencing Commission has recommended a change in the guidelines in the past, the fact remains that this special offense characteristic still exists.  As the Second Circuit observed "the use of a computer is not essential to the act of distributing child pornography.  A person can traffic in child pornography without using a computer much like one could commit a robbery without the use of a gun." in *United States v. Reingold*, 731 F.3d 204, 226 (2d Cir. 2013); see also *United States v. Kiefer*, 760 F.3d 926, 931 (9th Cir. 2014) (finding no double counting for the inclusion of this special offense characteristic).  To properly calculate the guidelines, the Court must include this special offense characteristic as a computer was used to commit this offense.

In *United States v. McRee*, 625 Fed. Appx. 430, 433-434 (11th Cir. 2015), the Eleventh Circuit considered the defendant's objection to the district court's application of USSG § 2G2.2(b)(6) as "with technology today, child pornography offenses will almost always involve the use of a computer." However, in considering the "Commission report" that "undermin[ed] the enhancements under § 2G2.2," the Court held that the report "did 'not change the statutory sentencing scheme, the applicable sentencing guidelines, or the binding precedent about § 2G2.2 in this Circuit.'" *Id.* citing *United States v. Cubero,* 754 F.3d 888, 900 (11th Cir.). Thus, there is no statutory, judicial or administrative framework for this Court to ignore the application of the two-level increase pursuant to USSG § 2G2.2(b)(6).

### 4.  <u>Response to Factual Objection – Paragraph 34</u>

Defendant disputes that he was reluctant to allow law enforcement to use his account for investigative purposes. The government does not contest that Defendant was cooperative during the interview and ultimately allowed investigators to take over his account, but his objection is at odds with his interview with the FBI.

Upon being asked for his account, Defendant expressed his view that the existence of Website A was a matter of "freedom" and it was a place where users could, for example, disclose that they enjoyed being sexually abused as children and that this experience was a positive influence on their lives. For example, he stated that people on Website A could say things like "Gee, you know, I really and truly enjoyed what happened with…when I was eight years old, nine years old, whatever it is. And no, I don't feel ashamed, I don't feel that having sex with my brother was a problem, type of thing." Audio Recording of Defendant's Interview at 41:03-43:02.

The FBI agent extensively explained that using Defendant's account could lead to the discovery of people who were actively harming children. The agent could not have been clearer:

"I'm talking about going after the guys that are hurting children. The really bad guys. Now are you comfortable doing that?" In response, Defendant suggested that he would only consent if the FBI demonstrated to him that someone was hurting a child and not if someone was simply trafficking in child pornography. Specifically, he stated "If you could show me that somebody was hurting children, I would help you catch them." *Id.* at 47:50-48:30. After the agent pressed further, Defendant stated, "I don't know that I'm comfortable because ***I would feel that I'm letting down the other people who believe in the freedoms.***" *Id.* at 48:19-33 (emphasis added).

After continuing to go back-and-forth with the agent, Defendant ultimately agreed to allow the FBI to use his account approximately fifteen minutes after he was first asked. *Id.* at 55:48-53.

**Conclusion**

For the above reasons, the Government requests this Honorable Court to overrule the defendant's objections to the PSR.

Respectfully submitted,
JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By: s/ *GREGORY SCHILLER*
Gregory Schiller
Assistant United States Attorney
Fla. Bar. 048477
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Email: gregory.schiller@usdoj.gov

By: *s/Kyle Reynolds*
Kyle Reynolds
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Child Exploitation and Obscenity Section
Court ID # A5502872
1301 New York Avenue, NW
Washington, DC 20005
Email: kyle.reynolds@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on December 2, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified.

<span style="margin-left:40%">s/*Gregory Schiller*_____</span>
<span style="margin-left:40%">Gregory Schiller</span>
<span style="margin-left:40%">Assistant United States Attorney</span>