**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-80107-CR-CANNON**

**UNITED STATES OF AMERICA,**

**v.**

**SELWYN DAVID ROSENSTEIN,**

**Defendant.**

_____/

**UNITED STATES SENTENCING MEMORANDUM AND**
**RESPONSE TO THE DEFENDANT'S MOTION FOR DOWNWARD VARIANCE**

    **COMES NOW,** the United States of America, by and through its undersigned Assistant

United States Attorney, and respectfully submits the following as the government's sentencing

memorandum and response to the defendant's motion for downward variance in this matter:

**I.    INTRODUCTION**

> *Child pornography is a vile, heinous crime.  Mention the term to your average*
> *American and he responds with immediate disgust and a sense of unease.  However,*
> *once it enters the legal system, child pornography undergoes sterilization.  The*
> *sterilization goes far beyond properly removing emotion from sentencing decisions.*
> *Images are described in the most clinical sense.  Victims all too often remain*
> *nameless.  The only emotions on display are those of defendants, sorry that their*
> *actions were discovered by law enforcement.*

*United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010).

    The Defendant, Selwyn David Rosenstein, pleaded guilty to trafficking in child

pornography, also known as "child sexual abuse material" or "CSAM."  In this sense, he is like

many other defendants who face sentencing every day for committing this "vile, heinous crime."

    But the Defendant is no ordinary defendant convicted of CSAM offenses.  He did not

simply consume or download CSAM, as so many other defendants do.  He did much, much more.

The Defendant was one of the leaders of an international enterprise that ran "Website A," which was dedicated to the advertisement and distribution of CSAM and the discussion of the sexual abuse of children. Website A featured thousands of members. By his own admission, the Defendant was the ***third- or fourth-highest ranking*** member of the website. Over the course of several years, he spent extensive time and effort managing and maintaining the site so he and others could have a place to come together, exchange and consume CSAM, and discuss the sexual abuse of children. Website A was not simply a website; it was a large, active community of pedophiles and CSAM enthusiasts. And it existed in part because of the Defendant's criminal acts.

But the Defendant's actions did not stop there. He also maintained an enormous collection of images and videos depicting the sexual abuse and exploitation of children. His collection was so large that he had to use the server of his private company to store all of it. This content included depictions of infants and toddlers and depictions of rape, violence, and torture. And outside of the charged offenses, the Defendant has engaged in deeply troubling sexual conduct, which includes the secret filming of children in his backyard wearing bathing suits and changing their clothes.

The United States opposes the variance request and, in light of the 18 U.S.C. § 3553(a) factors, submits that a within-Guidelines sentence of 30 years is lawful, just, and appropriate, and accounts for the mitigating factors in this case, including the Defendant's confession and prompt acceptance of responsibility.

## II.    BACKGROUND

After his arrest, the United States indicted the Defendant on eight counts arising out of his involvement with Website A: one count of engaging in a child exploitation enterprise, one count of conspiracy to advertise child pornography, five counts of advertisement of child pornography, and one count of possession of child pornography, all in violation of 18 U.S.C. §§ 2251(d) and (e),

and 2252A(a)(5)(B), (b)(2), and (g).  (Doc. 13.)  Not long after, the parties entered into a plea agreement in which the United States agreed to dismiss the count of engaging in a child exploitation enterprise—which carries a minimum sentence of 20 years in prison and a maximum sentence of life—in exchange for the Defendant's plea of guilty to every other count in the Indictment.  (Docs. 28-29.)

The U.S. Probation Office filed a final presentence investigation report recommending the following Guidelines calculation:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)); | 22 |
| Enhancement for trafficking in material that involved a prepubescent minor and a minor who had not attained the age of 12 years (*id.* § 2G2.2(b)(2)); | +2 |
| Enhancement for distributing in exchange for non-pecuniary consideration (*id.* § 2G2.2(b)(3)(B)); | +5 |
| Enhancement for trafficking in material that portrays masochistic conduct or other depictions of violence or sexual abuse of exploitation of an infant or toddler (*id.* § 2G2.2(b)(4)); | +4 |
| Enhancement for use of a computer or interactive computer service for receipt of child pornography (*id.* § 2G2.2(b)(6)); | +2 |
| Enhancement for an offense involving more than 600 images (*id.* § 2G2.2(b)(7)(D)); | +5 |
| Enhancement for being an organizer/leader of criminal activity involving more than five individuals (*id.* § 3B1.1(a)); | +4 |
| Reduction for demonstration of acceptance of responsibility (*id.* § 3E1.1(a)); | -2 |
| Reduction for timely notification of intent to plead guilty (*id.* § 3E1.1(b)).[1] | -1 |
| **TOTAL:** | **41** |

(PSR ¶¶ 51-66.)  This Guidelines calculation is accurate and reflects the facts underlying the Defendant's offense.  Within Criminal History Category I, the Defendant's Guidelines range is thus **324 to 405 months**.  (PSR ¶¶ 66, 112.)

---

[1]  If the Court determines that the Defendant has accepted responsibility and is entitled to a 2-level reduction under U.S.S.G. § 3E1.1(a), the United States moves to adjust the Defendant's offense level downward by one level pursuant to § 3E1.1(b) for timely notifying the Government of his intention to plead guilty.

The Defendant objects to certain aspects of this Guidelines calculation.  (Doc. 36.)  The United States has explained why these objections should be overruled.  (Doc. 38.)  The Defendant has also filed a memorandum requesting a downward variance to the minimum possible sentence, which in this case is 15 years in prison.  (Doc. 37.)

### III.    ARGUMENT

There are no factors that warrant a variance or departure from the Guidelines range. Despite his egregious criminal conduct, the Defendant seeks the ***minimum possible sentence***, which grossly underserves many of the factors set forth in 18 U.S.C. § 3553(a).  The Defendant's conduct, taken with the sentencing factors set forth in § 3553(a), demands a 30-year sentence.

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.'" 18 U.S.C. § 3553(a)(4)(A).  The Sentencing Guidelines are the appropriate starting point from which the Court exercises its discretion under § 3553(a). *See United States v. Crawford*, 407 F.3d 1174, 1178–79 (11th Cir. 2005).  This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes

of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated defendants for to avoid sentence disparities.  18 U.S.C. § 3553(a)(6).  Consideration of these factors necessitates a 30-year sentence.

A.  **Nature and circumstances of the offense**

The final PSR provides a thorough overview of Website A.  (PSR ¶¶ 11-22.)  Suffice it to say that Website A was a sprawling and complex criminal enterprise catering to pedophiles and enthusiasts of CSAM.  Anyone who encountered it would have immediately understood that it was dedicated to the exchange of images and videos depicting the rape, abuse, and exploitation of minors.  Users of the website—of which there were thousands—trafficked in large volumes of CSAM and discussed the sexual abuse of minors.  (*Id.*)  Users were required to share CSAM and participate in conversations with other users to become members and access most of the site.

But Website A was more than just a website or a place to acquire CSAM.  It was a flourishing community where offenders could come together, discuss their interests, share information, provide advice on how to avoid law enforcement, and normalize one another's sexual desire for young children.  And the technology underlying Website A was designed to allow those offenders to engage in these activities anonymously but openly, and with a measure of assurance that their crimes would not be detected.  (PSR ¶ 11.)

All of this was possible because of the dedicated work of the Defendant and the other leaders of Website A, who facilitated CSAM offenses on a massive, global scale.  The Defendant described himself as the third- or fourth-highest ranking member of the website, although law enforcement believes, based on his level of participation in Website A's management, that he was

second-in-command.  (PSR ¶ 33(c).)  He participated in staff meetings, exercised decision-making authority with regard to the promotion of users, advised other staff members about how to moderate Website A, compiled statistics on other users' sharing of CSAM to facilitate decisions on promotions, and provided crucial technical support for the site, including by backing up the servers to ensure that the website could continue in case of a crash.  (*Id.* ¶¶ 25-29, 33, 36; *see also* Doc. 38 at 5-10.)  He instructed Website A users on how to properly post and share child pornography over the website in accordance with the website's rules.  (PSR ¶ 27.)  He also provided guidance and instructions to the website's users on how to remain secure and anonymous in order to avoid being detected by law enforcement.  (*Id.* ¶ 26.)

The Defendant was therefore not a casual, tepid, or conflicted participant in this enterprise dedicated to the sexual exploitation of children.  Instead, he fully committed himself to Website A, rose through the ranks to nearly the highest echelon of Website A leadership, and spent significant amounts of time ensuring that the website functioned properly and that others followed the rules.  He boldly told law enforcement that he thought the existence of Website A was a matter of "freedom."  (PSR ¶ 33(k).)  This was not a crime of opportunity or the result of a momentary lapse of judgment.  Instead, the Defendant's crimes took sustained planning, effort, and time.

The Defendant did not just hold abstract views about "freedom," either.  He dedicated himself to Website A because he harbored a deep and pervasive interest in images and videos depicting children being sexually abused.  This is most evident from his personal collection of CSAM, which was shockingly voluminous.  FBI agents who analyzed the Defendant's devices recovered more than 150,000 images and videos depicting CSAM that took up terabytes of data.  (*See, e.g.,* PSR ¶¶ 33(f), 35, 38.)  This included at least 1,200 videos that were more than five minutes long, and some videos that were as long as three hours.  (*Id.* ¶ 38.)  The Defendant also

had more than two and a half million additional images and videos depicting child erotica or images depicting individuals engaged in sexually explicit content who could be children, but whose age could not be clearly confirmed.  In fact, the Defendant collected so much sexually explicit content depicting children that he ran out of space for it on his personal devices and needed to utilize space on the server he used to run his business.  (*Id.* ¶ 33(f).)  The Defendant's collection included depictions of the sexual abuse of infants and toddlers as well as content that showed children being subject to torture, violence, and bondage.  (*Id.* ¶¶ 33(g), 37.)  He claimed that he was not interested in violent CSAM, but did not fully explain why he chose to collect it and store it on his devices at home.

Although this Court must consider other factors beyond the Defendant's offense conduct, this Court should nonetheless give significant weight to his offense conduct in crafting his sentence here. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court.").

### B.  History and characteristics of the Defendant

The Defendant's history and characteristics also weigh strongly in favor of a 30-year sentence.  It is common for lawyers and even judges to refer to someone without previous convictions as having no "criminal history," but this misses the mark.  The Defendant engaged in constant federal criminal activity for a period spanning at least three years.  (*See, e.g.,* PSR ¶¶ 23, 33(d).)  While managing Website A, the Defendant almost certainly engaged in criminal conduct and acts in furtherance of a criminal conspiracy on a near-daily basis.  He has no convictions, but his criminal history is extensive.

The Defendant committed these offenses because he is plainly sexually attracted to children.  He admitted that he masturbated when viewing CSAM and that his "age of attraction"

depends on his "mood," but includes girls as young as 9 years old.  (PSR ¶ 33(h)-(i).)  He told another individual on Website A that his age of attraction was between 8 and 12.  (*Id.* ¶ 36(a).)

In addition to a staggering quantity of child pornography, the Defendant's computers also contained a highly detailed "guide" for performing sex acts upon children without injuring them or being detected.[2]  The purpose of the guide was not subtle: "This is a manual that teaches you how to have sex with little girls safely. …  The focus is really on girls between 3 and 6 years of age or a little more.  In my view girls from around 8 years of age and up are 'big girls' and you can have sex with them quite easily."  The guide contained advice that included the following:

- A section entitled "An age guide for fucking young girls," which advised the following: "2 to 4 year olds—anal only" and "5 years old and you can do it all."

- Detailed instructions on how to stretch a young girl's vagina and anus to be receptive to being penetrated by an adult man's penis.

- Diagrams and at least one image depicting vaginal tears.

- A section entitled "Cum," which stated that "It's better to cum on your girl or in her mouth, not in the pussy" because, among other reasons, "[i]t can leak into their underwear and get noticed."

- Instructions on sex toys, including what types of toys to use on children at various ages.

- Instructions on keeping a child's genitals clean after sexual abuse so they do not develop infections, which could lead to a doctor inquiring into whether the child is being abused. This section stated "REMEMBER – This is the last thing your wife should hear – 'Mommy, it hurts when I pee.'"

---

[2]  The United States will make this "guide" available for the Court's review at sentencing, if requested.

The "guide" is littered with diagrams, medical-type photos, and CSAM. Needless to say, the Defendant's possession of this "guide" is deeply troubling.

The Defendant has also engaged in sexually exploitative conduct outside of his involvement with Website A and CSAM. First, when he was residing outside of the Southern District of Florida, the Defendant surreptitiously filmed young children who were wearing bathing suits in his backyard. After seizing his computers, FBI analysts discovered more than 1,300 images and 40 videos of his backyard pool, each of which depicted at least one child. These images and videos appeared to have been taken from a camera mounted outside the Defendant's home or through the blinds of the windows overlooking the pool, and they depicted girls as young as toddlers playing in and around the pool. The still images focused on children walking or changing their clothes, and in taking these images, the Defendant appears to have zoomed in on the children's buttocks. FBI analysts also uncovered text files that accompanied some of the videos, and which contained notes that corresponded with certain events in the videos. For example, one note stated "take it off" and corresponded with a time when a child was changing her clothes, and another referred to the "butt" of a named individual at the time when the video depicted a three- or four-year-old girl changing and unknowingly exposing her buttocks to the camera.

Second, the Defendant engaged in at least one exploitative sexual relationship with a blood relative. This relative told law enforcement that the Defendant groomed her into an incestuous relationship when she was approximately 20 years old and he was in his mid-to late-40s, and the relationship included him taking nude photos of her. This relative told law enforcement that she believed the Defendant took advantage of her because her father died when she was young and she had no father figure. The relative stated that just before her wedding, approximately ten years after her relationship with the Defendant ended, the Defendant told her that "even though you are getting

married I will still fuck you." While this incident concerns a sexual relationship with an adult and not a child, it is relevant to the matter before the Court because it reveals the Defendant's willingness to engage in manipulative and exploitative sexual behavior.

Third, as disclosed in his expert psychological report, the Defendant on one occasion in his 30s exposed his genitals to a non-consulting adult for sexual purposes and on another occasion touched another person's genitals and pretended it was accidental. (Doc. 37 at 67.)

In addition, although the Defendant pleaded guilty and accepted responsibility for the charged offenses, he expressed little understanding at the time of his arrest that his criminal conduct was harmful. He told the FBI that he did not think that trafficking in CSAM is harmful because the child victims have already been abused. (PSR ¶ 33(k).) He believed that the existence of websites like Website A was a matter of "freedom." (*Id.*) He was initially unconformable with allowing the FBI to use his account on Website A for investigative purposes in part because "*I would feel that I'm letting down the other people who believe in the freedoms.*" Audio Recording of Defendant's Interview at 48:19-33 (emphasis added). And when the FBI knocked and announced during the execution of the search warrant at his home, the Defendant's first impulse was to try to warn another person who was on Website A. (PSR ¶¶ 33(m), 36(a).)

The Defendant also possesses skills that he used to build a successful business and livelihood, and these are the same skills he used in his offenses. Specifically, he received a degree in computer science, has specialized training and ability with computer programming and analysis, and for nearly 40 years he operated a business that sold computerized accounting systems. (PSR ¶¶ 94-95, 98.) These are the same skills he used to provide extensive support for Website A.

With respect to the conclusions of the psychological report of Dr. Michael Brannon submitted with the Defendant's sentencing papers, there is reason to suspect that the Defendant

may have downplayed certain aspects of his conduct. In particular, the Defendant appears to have told the examiner that "he has never taken a video or picture of a juvenile in the community for sexual purposes." (Doc. 37 at 67.) This is simply not true. As detailed above, the Defendant took videos and pictures of young children in his backyard pool, and when he did so he zoomed in on their buttocks and created annotations for sexualized moments in the videos.

In addition, Dr. Brannon's report makes findings as to the Defendant's risk of recidivism, but the actuarial tool he used to make these predictions—the "Child Pornography Offender Risk Tool" or "CPORT"—systematically understates the likelihood of recidivism. This is because the CPORT defines recidivism not as the commission of a new offense, but rather whether a person has any "new arrests, new charges, or new convictions for sexual crimes, based on official records." Angela Wyatt Eke, et al., *Scoring Guide for the Child Pornography Offender Risk Tool (CPORT): Version 2* at 4 (2018). Put differently, the CPORT does not actually measure the risk of recidivism; it measures the risk that a person will commit another sexual offense ***and then get caught and then arrested***. Countless offenders are never detected, and some who are detected are never arrested. The Defendant's true risk of recidivism cannot be measured by the CPORT.

In addition, there is reason to believe that the Defendant is less likely to be caught than the average offender. The Defendant is highly sophisticated offender with extensive technical skills who came to law enforcement's attention only because he was a leader of a global CSAM enterprise. He is vastly more capable than the average offender of continuing to commit online CSAM offenses without detection.

### C.  <u>The need for the sentence imposed</u>

There can be no doubt the "prevention of sexual exploitation and abuse of children constitutes a government objective of *surpassing importance*." *New York v. Ferber*, 458 U.S. 747,

757 (1982) (emphasis added). The Court in *Ferber* went on to note that "[i]t has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults." *Id*. at 758 n.9. As the Supreme Court put it nearly thirty years after *Ferber*, "the demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is 'a permanent record' of the depicted child's abuse, and 'the harm to the child is exacerbated by its circulation,'" *Paroline v. United States*, 572 U.S. 434, 439-40 (2014) (quoting *Ferber*, 458 U.S. at 759) (punctuation altered). In the age of the internet, children whose sexual abuse is filmed and shared online must know that for as long as they are alive, offenders will trade and view images of them when they were exploited and traumatized. CSAM victims whose images are in online circulation can never truly know whether someone they know has seen depictions of their rape or abuse.

Retribution is a valid penological goal. As the Eleventh Circuit explained: "because punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be. The seriousness of a crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

*Id.* (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59). Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)).

As demonstrated, the Defendant's conduct is reprehensible. He was part of a tight-knit group of individuals who together managed and directed an enterprise dedicated to CSAM and the discussion of the sexual abuse of children. The Defendant participated enthusiastically in this community and spent significant time and effort fostering this enterprise. He also maintained and consumed enormous quantities of CSAM in his home, including CSAM depicting very young children. This conduct weighs heavily in favor of a 30-year sentence.

### D. <u>Need to reflect the seriousness of the offense, promoting respect for the law, and provide just punishment</u>

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). Congress enacted federal criminal laws targeting CSAM production and trafficking to address ongoing sexual abuse and victimization of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43, 56. But this legislation and its later amendments are more than prophylactic measures. They reflect value judgments and accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43.

The Defendant's actions violated federal law, but they also transgressed universally recognized moral principles—specifically, the need to protect and nurture children and not to be titillated by depictions of their rape and abuse. Through his own direct conduct and the conduct

he facilitated through his management and support to Website A, the Defendant exploited thousands of children and helped to revictimize them through the continued traffic in images depicting their abuse.  This Court's sentence must express social condemnation of his crimes.

### E.  **Adequate deterrence and need to protect the public**

Deterrence is important for crimes involving the sexual abuse of children, including trafficking in CSAM.  "Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced." *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (quoting *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)).  The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003). The Defendant fits within that class.  For this reason and others, "general deterrence is crucial in the child pornography context." *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012) (quoting *United States v. Camiscone*, 591 F.3d 823, 834 (6th Cir. 2010)) (punctuation altered).

### F.  **Length of sentence imposed, guidelines appropriateness, and sentencing alternatives**

#### 1.    The Sentencing Guidelines are appropriate

The Eleventh Circuit has stated that "[t]hough we do not apply a presumption of reasonableness to a sentence within the guidelines range, we ordinarily expect such a sentence to be reasonable.  A sentence below the statutory maximum can also be indicative of reasonableness." *United States v, Cogli\anese*, 34 F.4th 1002, 1009 (11th Cir. 2022).  Nonetheless, the Defendant

asks for the minimum possible sentence, in part because he contends that the Sentencing Guidelines for CSAM offenses are "arbitrary" and unreasonably harsh.  (Doc. 37 at 12.)

The Defendant's argument fails.  For starters, the Eleventh Circuit has rejected the argument that § 2G2.2 is flawed.  In *United States v. Pugh*, for example, the Eleventh Circuit acknowledged that the Supreme Court has held that "a district judge has the authority to deviate from the Guidelines in a particular crack cocaine case because the Guidelines range for these offenses … did not take account of 'empirical data and national experience.'"  515 F.3d 1179, 1201 n.15 (11th Cir. 2008) (quoting *Kimbrough v. United States*, 552 U.S. 85 (2007)).  It observed, however, that *§ 2G2.2 "do[es] not exhibit the deficiencies the Supreme Court identified in Kimbrough*."  *Id.*  Likewise, in *United States v. Wayerski*, the Eleventh Circuit rejected an argument that "the Sentencing Guidelines for child-pornography offenses are irrational and not empirically based…"  624 F.3d 1342, 1354 (11th Cir. 2010); *see also United States v. Cubero*, 754 F.3d 888, 900-01 (11th Cir. 2014) (similar); *United States v. Snipes*, 611 F.3d 855, 870 (11th Cir. 2010) ("the absence of empirical evidence is not an independent ground that compels the invalidation of a guideline").

Further still, much of the criticism of § 2G2.2 is greatly exaggerated, and the Guideline appropriately provides enhancements for aggravating conduct.  For example, it cannot be reasonably disputed that an offender who consumes images that depict infants or violence is more culpable that one who does not.  *See* U.S.S.G. § 2G2.2(b)(4).  Nor can it be questioned that an offender who distributes child pornography is more culpable than one who simply downloads or consumes it.  *See id.* § 2G2.2(b)(3).  Nor that an offender who traffics in a larger volume of child pornography is more culpable than one who traffics in a smaller amount.  *See id.* § 2G2.2(b)(7).

And even if any of the Defendant's criticisms of the CSAM Guidelines were valid in the abstract, the criticisms are certainly not valid as to the Defendant himself.  Most relevant to the Defendant, Section 2G2.2 does not include an enhancement for participation in an online community of CSAM offenders, much less being a leader of such a community.  For this reason, § 2G2.2 could even **understate** the Defendant's culpability.

This idea is endorsed by the Sentencing Commission.  In its 2012 Report to Congress, the Commission identified participation in online CSAM communities as one of three of the most significant factors that should be incorporated into § 2G2.2:

> [T]he Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases:
>
> (i)    the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the age of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technologies");
>
> (ii)   the degree of an offender's involvement with other offenders—in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and
>
> (iii)  whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at xvii-xviii (December 2012) ("2012 Report").[3]

---

[3] The full report is available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last visited December 5, 2022).

**All three** of these factors endorsed by the Sentencing Commission counsel in favor of a substantial sentence for the Defendant.  As to CSAM communities, the Commission concluded that the existence of such communities "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online."  2012 Report at 94.  The Commission found that such communities are also dangerous because they normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and may lead offenders to progressing from viewing CSAM to committing other sex offenses.  *Id.* at 97.  The 2012 Report suggested that not accounting for CSAM communities could result in Guidelines ranges that are "**unduly lenient**."  *Id.* at xviii, 321 (emphasis added). Being a leader  and facilitator of a CSAM community, of course, is much more aggravating than merely participating in one.

The other two factors identified by the Commission apply with equal force to the Defendant.  As to his CSAM collection, it was gargantuan and included terrible sex acts being perpetrated on children of all ages, including infants.  As noted above, he could not fit it all on his personal devices and had to store it on his company's server.  He committed his crimes in part through the sophisticated technical means of the encrypted, anonymous Tor network.  And, as described above, the Defendant has on several occasions engaged in exploitative and predatory sexual conduct.

### 2.   Comparable cases support the United States' recommendation

The Defendant identifies two supposedly comparable cases, but neither is comparable to his offense.  (*See* Doc. 37 at 9.)  Both *United States v. Beaver* and *United States v. Reed* involved defendants who searched for, downloaded, and CSAM through peer-to-peer networks.  *See United States v. Beaver*, No. 6:13-cr-302, Doc. 32 at 16-17 (M.D. Fla. March 5, 2014) (Factual Basis);

*United States v. Reed*, No. 6:12-cr-328, Doc. 35 at 19-21 (M.D. Fla. Feb. 27, 2013) (Factual Basis). Neither case involved an offender was a member of a sophisticated online child-exploitation community, much less a leader of such a community like the Defendant.

The Defendant's circumstances are much more analogous to defendants in *United States v. Falte, et al.*, No. 3:17-cr-44 (M.D. Tenn.). The defendants in that case, like the Defendant, were involved with websites operating over the Tor network that were dedicated to the advertisement and distribution of CSAM and the discussion of child sexual abuse. *Id.*, Doc. 232 at 1-2. Defendants Falte and Faulkner were decision-making organizers and leaders of such websites, and Judge Crenshaw of the Middle District of Tennessee sentenced each to ***35 years*** in prison. *Id.*, Docs. 232 at 2-3, 10-13; 237 at 3; 239 at 3.[4] Another defendant, Leslie, who created and administered another Tor network CSAM website, received ***30 years*** in prison. *Id.*, Docs. 232 at 9; 248 at 2. A final defendant who was merely a mid-level moderator on a website—a position much lower than the Defendant in this case—received 20 years. *Id.*, Docs. 232 at 9-10; 250 at 3.

Co-administrators of other CSAM websites received similar sentences. Defendant Lane in the case of *United States v. John Doe #1, et al.*, No. 5:10-cr-319, (W.D. La.), for example, was a co-administrator of a CSAM website who advertised and distributed CSAM over the site, and Judge Hicks of the Western District of Louisiana sentenced him to ***30 years*** in prison. *Id.*, Docs. 965-2 at 1-5, 972 at 2. Defendant Childs was a "VIP" of the same website—a rank lower than co-administrator— and received ***30 years*** in prison. *Id.*, Docs. 320-2 at 1-5; 439 at 2.

The Defendant is also similarly situated to the defendant in *United States v. Chase*, No. 5:15-cr-15 (W.D.N.C.). The defendant Chase was, similar to the Defendant, the lead administrator

---

[4] These two defendants also engaged in the hands-on sexual abuse of a minor victim, although this was the subject of separate prosecutions and separate sentences in another district. *See United States v. Falte*, No. 3:17-cr-49 (E.D. Va.); *United States v. Faulkner*, No. 3:17-cr-45 (E.D. Va.).

of a Tor network website dedicated to CSAM.  Judge Voorhees of the Western District of North Carolina sentenced him to **30 years** in prison.  *Id.*, Doc. 136 at 2.  Other staff members of the website received 20 years.  *Id.*, Docs. 170 at 2; 171 at 2.

These cases are much more similar to the Defendant's than cases involving defendants who simply viewed or downloaded CSAM and supports a sentence of 30 years.

### 3.   The United States' recommendation is appropriate

The United States' recommended sentence of 30 years is appropriate.  The aggravating factors in this case are significant and far outweigh the mitigating factors.  Nevertheless, a sentence of 30 years accounts for the few mitigating factors that there are—specifically, the Defendant's prompt acceptance of responsibility, his confession, and his apparently otherwise law-abiding life.

As noted above, the Defendant's Guidelines range is 324 to 405 months.  The United States' recommended 360-month sentence falls within the lower half of that range.  This range already reflects the three-point reduction under § 3E1.1 for his acceptance of responsibility and timely guilty plea, without which his Guidelines range would be life in prison.

The Defendant asks the Court to treat him differently than a defendant who has committed a hands-on sex offense against a child, and the United States agrees.  (*See* Doc. 37 at 8.)  The fact that the United States has no evidence that the Defendant has molested a child, however, does not lessen the enormity of the crimes charged in the Indictment.

The United States recognizes that a 30-year sentence may well be a life sentence for the Defendant.  Taking into account the 15% reduction in the sentence length for good-time credits, *see* 18 U.S.C. § 3624(b), a 30-year sentence would require the Defendant to serve more than 25 years in prison.  Nevertheless, the Defendant's age and life expectancy do not outweigh the gravity of his offenses.  The Defendant, while well into his later years, chose to commit exceptionally

serious offenses that carry lengthy prison sentences.  No one forced him to do this.  Having chosen to commit these offenses in his late 60s, he should not now be permitted to use his age as a shield against just punishment.

## IV.    CONCLUSION

Selwyn David Rosenstein was a highly committed and dedicated leader of a community dedicated to CSAM and the sexual exploitation of children.  He committed numerous federal child-exploitation crimes and facilitated countless more.  He is vastly more culpable than the average CSAM offender, and a 30-year sentence is just, appropriate, and fully supported by the § 3553(a) factors.  The United States respectfully requests that the Court sentence the Defendant to 30 years in prison, followed by a lifetime term of supervised release.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By: s/ *GREGORY SCHILLER*_____
    Gregory Schiller
    Assistant United States Attorney
    Fla. Bar. 048477
    500 S. Australian Ave., Suite 400
    West Palm Beach, FL 33401
    Phone: 561-209-1045
    Email: gregory.schiller@usdoj.gov

STEVEN J. GROCKI
CHIEF

By: *s/ KYLE P. REYNOLDS*_____
    Kyle P. Reynolds
    Trial Attorney
    U.S. Dept. of Justice, Criminal Division
    Child Exploitation and Obscenity Section
    Court ID # A5502872
    1301 New York Avenue, NW
    Washington, DC 20005
    Phone: (202) 616-2842
    Email: kyle.reynolds@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 5, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified.

  s/*Kyle P. Reynolds*
Kyle P. Reynolds
Trial Attorney